# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————————

Nº 13-CV-5161 (JFB)

———————————————

ROCKSTONE CAPITAL LLC,

Appellant,

VERSUS

ALISA METAL, KEITH BUB A/K/A KEITH L. BUB, AND
KENNETH KIRSCHENBAUM, ESQ., CHAPTER 7 TRUSTEE,

Appellees.

———————————————

**MEMORANDUM AND ORDER**
April 2, 2014

———————————————

JOSEPH F. BIANCO, District Judge:

Rockstone Capital LLC ("Rockstone") appeals from an order entered by the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court") in the bankruptcy proceeding of debtor Keith Bub ("Bub" or "debtor"). By Order dated July 22, 2013, the Honorable Robert E. Grossman denied Rockstone's motion objecting to the priority of a claim filed by debtor's former spouse, Alisa Metal ("Metal"). The Bankruptcy Court determined that Metal's claim represented a claim for a domestic support obligation ("DSO"), a claim which has the highest priority pursuant to Section 507 of the Bankruptcy Code.

On appeal, Rockstone argues that the Bankruptcy Court's July 22, 2013 Order should be vacated and remanded on the following grounds: (1) the Bankruptcy Court reached its decision without holding an evidentiary hearing, and without allowing Rockstone to conduct discovery; and (2) the Bankruptcy Court's finding that Metal's claim was a DSO was clearly erroneous. For the reasons set forth below, this Court vacates the Bankruptcy Court's July 22, 2013 Order and remands the case to the Bankruptcy Court for the purpose of conducting further factual development before deciding whether Metal's claim is a DSO. Specifically, the Bankruptcy Court correctly recognized that an income discrepancy between husband and wife at the time of separation or divorce is an important factor to consider in deciding whether a debtor's obligation to his former spouse represents a DSO. However, the Bankruptcy Court did not make a finding related to debtor's and Metal's relative incomes at the time of their separation agreement. Because the factual record is thus incomplete (and there appears to be a factual dispute on this issue), the Court remands the

case to the Bankruptcy Court for further factual development on this issue.

## I. BACKGROUND

### A. Facts

In 1993, Bub and Metal purchased a home in Hauppauge, New York (the "marital residence") for approximately $300,000. (R-4 & R-5,[1] Dep. of Alisa Metal, Jan. 11, 2011 ("Metal N.Y. Dep."), at 18–20.[2]) Bub and Metal each contributed $50,000, and they financed the rest of the purchase with a $200,000 loan from Metal's father, David Metal. (*Id.*) In exchange, David Metal was granted a mortgage on the marital residence. (*Id.*) At the time of purchase, the deed to the marital residence was in Metal's and David Metal's names. (*Id.* at 47.) Sometime in 1993 or 1994, the deed to the marital residence was transferred to Bub and Metal. (*Id.*)

Bub and Metal married on October 2, 1994. (R-1, at 18, Separation Agreement ("Separation Agreement"), at 1.) Over the course of their marriage, Bub and Metal granted three additional mortgages against the marital residence. First, they granted a mortgage to the Small Business Administration ("SBA") in exchange for a loan to one of Bub's businesses. (Metal N.Y. Dep. at 44–47.) Bub made all the loan payments to the SBA. (*Id.* at 62; R-16, Dep. of Alisa Metal, Sept. 19, 2011 ("Metal Fla. Dep."), at 42 ("From the time the SBA loan was acquired, it was Keith's and Keith's responsibility. He took care of it. He made his

payments. He did everything that he needed to do.").[3]) However, Metal was a co-signor on the loan. (Metal Fla. Dep. at 29; Metal N.Y. Dep. at 44–45; Settlement Agreement, at 7). The monthly payments on the SBA loan were $961 per month. (R-14, Dep. of Keith L. Bub, Jan. 14, 2010 ("Bub Dep."), at 74[4]; Metal Fla. Dep. at 16–17.) Second, the couple granted a mortgage to CitiMortgage in exchange for a loan to one of Bub's businesses. (Metal N.Y. Dep. at 61–62.) Third, Bub and Metal took out a Bank of America Equity Credit Line to pay off automobile loans and to assist Bub's business. (*Id.* at 44, 57–58.) The monthly payments on the home equity loan were approximately $1,500 per month. (*Id.* at 60.)

Bub and Metal maintained separate bank accounts and split most of their expenses evenly. (*Id.* at 26–27, 50.) According to Metal, their incomes were approximately equal for most of the marriage. (*Id.* at 26.) However, for a period of several months in 2004, Metal believed that she earned less than Bub because she was unemployed for a few months. (*Id.* at 52). In an affidavit submitted in support of her priority claim in Bub's bankruptcy proceeding, Metal averred that she earned $52,900 in 2004. (R-6, Aff. of Alisa Metal, July 17, 2012 ("Metal Aff.") ¶ 11.) In 2005, Metal claimed that her earnings had more than doubled to $115,000. (*Id.* ¶ 12.) After taxes and mortgage payments to David Metal and Bank of America, she claimed that she had a discretionary income of $146.66 per month.

---

[1] "R-__" refers to the numbered documents in the record filed with the Court on September 17, 2013. (*See* ECF No. 1.)

[2] This deposition of Metal was taken by counsel for Rockstone in connection with a civil suit filed by Rockstone against Bub, Total Computer Care, Ltd., and Anytime Anywhere Computing, Inc. in a New York state court. (*See* Metal N.Y. Dep. at 1–5.)

[3] This deposition of Metal was taken by counsel for Rockstone in connection with a civil suit filed in a

Florida state court by Rockstone against Bub, Metal, and Susan Lane, as Trustee of Land Trust Agreement Dated December 23, 2005. (*See* Metal Fla. Dep. at 1–5.)

[4] This deposition of Bub was taken by counsel for Rockstone in connection with the civil suit filed by Rockstone against Bub, Total Computer Care, Ltd., and Anytime Anywhere Computing, Inc. in New York state court. (*See* Bub Dep. at 1–5.)

(*Id.*) Bub, who ran his own business, testified that he did not "even know if [he] drew a salary" between 2005 and 2006, but that he certainly earned less than $100,000. (Bub Dep. at 85.) Moreover, Bub testified in 2010 that he had not drawn a salary from any of his businesses between 2006 and 2010. (*Id.* at 89–90.)

Sometime in 2005, after discovering that Bub had been unfaithful to her, Metal filed a petition for divorce in a New York state court. (Metal N.Y. Dep. at 37–38, 42.) Bub and Metal executed a Settlement Agreement on November 13, 2007 (Settlement Agreement, at 1), and a New York court entered a judgment of divorce, which incorporated the terms of the settlement agreement, on January 24, 2008 (R-1, at 40–42, Judgment of Divorce). The Settlement Agreement provided for no maintenance payments. It stated, in relevant part:

> The parties hereby waive payment of maintenance from one to the other and represent that each is capable of being self-supporting. Each releases and discharges the other, absolutely and forever, for the rest of his and her life from any and all claims and demands, past, present or future for support and maintenance. Neither party seeks maintenance from the other.

(*Id.* at 4–5.) According to Metal's affidavit, Bub received $610,000 in real property and cars. (Metal Aff. ¶ 4.) Metal stated that she received $491,000 in assets, to wit: the marital residence and a car. (*Id.* ¶ 5.) Bub and

Metal have no children together. (Settlement Agreement, at 1.)

As part of the Settlement Agreement, Metal also agreed to assume sole responsibility for the loans from David Metal and Bank of America. (*Id.* at 6.) Bub agreed to assume sole responsibility for the loans from CitiMortgage and the SBA. (*Id.* at 7.) With regard to the SBA loan, the Settlement Agreement states the following:

> The wife, who is a co-signor to the SBA loan, shall be entitled to security for the payment by the husband of the SBA loan in a timely fashion so as not adversely effect [sic] her credit and/or put in jeopardy her free and unencumbered use of or disposal of the residence at 24 Shandon Court, Hauppauge, NY. In addition, the lien by SBA shall be removed from the marital residence and from any liability against the wife no later than thirty-six (36) months from the date of this agreement.

(*Id.*) As collateral for Bub's obligation to pay the SBA loan and remove the SBA mortgage from the marital residence within thirty-six months, Bub transferred real property that he owned in Cape Coral, Florida (property he had acquired before the marriage) to a trust, of which he became the sole beneficiary, and granted a mortgage on the Florida property to Metal. (*Id.* at 7–9; Bub Dep. at 33–36, 50–52.)

As Metal explained the Settlement Agreement's provision concerning the SBA mortgage on the marital residence, Bub "had three years to move that load, where I was now trapped in my home, can't move can't

do anything—he had three years to move that loan to his own, wherever he decided to, which at that time he had no property to move it to or no asset to move it to, so it remained tied to my home." (Metal Fla. Dep. at 12.) Metal's expectation was not that Bub would repay the entire SBA loan in three years; instead, she expected that he would "collateralize his loan with another—with something else." (*Id.* at 28.) Until Bub could remove the SBA mortgage from the marital residence, Metal explained that she needed the mortgage on Bub's Florida property. (*Id.* at 12; *see* Metal N.Y. Dep. at 78 (explaining that she "needed him to collateralize his SBA loan by something").) At the time the Settlement Agreement was executed, Bub's Florida property was worth more than the balance of the SBA loan. (Metal Fla. Dep. at 12.)

In Metal's affidavit submitted in support of her priority claim in Bub's bankruptcy proceeding, Metal explained that the Settlement Agreement addressed "two overriding concerns." (Metal Aff. ¶ 2.) First, it addressed the concern "that each person should obtain title to the substantial assets with which each had a personal relationship." (*Id.* ¶ 3.) Second, it provided Metal with "sufficient revenue to be able to live." (*Id.* ¶ 6.) Specifically, as noted *supra*, in 2005, Metal earned $146.66 in discretionary monthly income after paying taxes, health and dental insurance, and mortgage payments to David Metal and Bank of America. (*Id.* ¶ 12.) Accordingly, she states that Bub's obligation to pay the SBA loan and remove the SBA mortgage from the marital residence was necessary for her to continue living in the marital residence. (*Id.* ¶ 14.) Bub also submitted an affidavit in support of Metal's priority claim, in which he averred that he

agreed to pay the SBA loan "to insure that she would have sufficient income to be able to fund her continued living expenses in our marital home, which was heavily mortgaged during the course of our marriage. (R-10, Aff. of Keith Bub, July 17, 2012 ("Bub Aff.") ¶ 3.)

By January 11, 2011 (the date of Metal's New York deposition), Bub had repaid the CitiMortgage loan. (Metal N.Y. Dep. at 85.) However, Bub stopped paying the SBA loan at some point. (Bub Dep. at 70–71, 148–49.) As a result, Metal has initiated foreclosure proceedings on the Florida property. (Metal N.Y. Dep. at 121.)

B. The Bankruptcy Proceeding

On November 22, 2011, Bub filed a voluntary petition for relief in the Bankruptcy Court pursuant to Chapter 7 of the Bankruptcy Code. (R-27, at 2.) According to the Bankruptcy Court, Bub's gross estate exceeds $130,000, and Rockstone is Bub's largest unsecured creditor, having filed a proof of claim in the amount of $774,225.35 based on a judgment against Bub. (A-1,[5] at 4–5 & n.2.)

On January 25, 2012, Metal filed a claim for $211,546.66 as a DSO priority claim pursuant to 11 U.S.C. § 507(a)(1)(A). (R-24.) Rockstone moved to disallow Metal's claim under 11 U.S.C. § 502(a) on June 15, 2012. (R-1, at 1.) Metal opposed Rockstone's motion on July 18, 2012, and submitted her own affidavit and Bub's affidavit in support of her priority claim. (*See* R-3.) Thereafter, Rockstone requested to conduct discovery in connection with the statements made in Metal's and Bub's affidavits. (R-13, at 1–2.) Rockstone also requested an evidentiary

---

[5] "A-__" refers to the numbered documents in the appendix to appellant's brief, which was filed with the Court on October 9, 2013. (*See* ECF No. 5.)

hearing on its objection to Metal's priority claim. (R-11.) Metal objected to Rockstone's discovery request, reminding the Bankruptcy Court that it had already denied Rockstone's request to conduct discovery on the basis that Rockstone had already conducted two depositions of Metal in connection with its New York and Florida state court cases. (R-12, at 1.) The Bankruptcy Court denied Rockstone's request to conduct further discovery (*see* A-3, at 29), and did not hold an evidentiary hearing.

By Order dated July 22, 2013, the Bankruptcy Court denied Rockstone's motion objecting to Metal's priority claim. (A-2.) In an accompanying Memorandum, the Bankruptcy Court held that Metal's claim was a DSO that was entitled to the highest priority under Section 507(a)(1) of the Bankruptcy Code. (A-1.)

## C. Appeal

Rockstone filed a notice of appeal in the Bankruptcy Court on August 2, 2013, which was docketed in this Court on September 17, 2013. Rockstone filed its brief on October 9, 2013. Metal filed her brief on October 23, 2013. Rockstone filed its reply brief on November 6, 2013. The Court has fully considered the arguments and submissions of the parties.

## II. STANDARDS OF REVIEW

Rule 8013 of the Federal Rules of Bankruptcy Procedure provides that a reviewing court may "affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree," or it may "remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

The Court reviews the Bankruptcy Court's legal conclusions *de novo* and its factual findings for clear error. *See Denton v.*

*Hyman (In re Hyman)*, 502 F.3d 61, 65 (2d Cir. 2007) ("The Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual conclusions are reviewed for clear error."); *see Bankruptcy Servs., Inc. v. Ernst & Young (In re CBI Holding Co., Inc.)*, 529 F.3d 432, 449 (2d Cir. 2008); *Lubow Mach. Co. v. Bayshore Wire Prods. Corp. (In re Bayshore Wire Prods. Corp.)*, 209 F.3d 100, 103 (2d Cir. 2000); *Shugrue v. Air Line Pilots Ass'n, Int'l (In re Ionosphere Clubs Inc.)*, 922 F.2d 984, 988–89 (2d Cir. 1990). "'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Dist. Lodge 26, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. United Techs. Corp.*, 610 F.3d 44, 51 (2d Cir. 2010) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)); *see also Collins v. Hi-Qual Roofing & Siding Materials, Inc.*, Nos. 02-CV-0921E(F), 02-CV-0922E(F), 2003 WL 23350125, at *4 n.16 (W.D.N.Y. Dec. 18, 2003) ("'[A] finding is only clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . This standard precludes this Court from reversing the Bankruptcy Court's decision if its account of the evidence is plausible, even if this Court is convinced that it would have weighed the evidence differently." (quoting *In re B. Cohen & Sons Caterers, Inc.*, 108 B.R. 482, 484 (E.D. Pa. 1989))).

The Court reviews the Bankruptcy Court's discovery rulings under an abuse of discretion standard. *See, e.g., Pricewaterhousecoopers LLP v. Giddens (In re MF Global Inc.)*, --- B.R. ----, No. 13-CV-8893 (VM), 2014 WL 667486, at *2 (S.D.N.Y. Feb. 20, 2014) ("The bankruptcy court's discovery rulings 'are reversed only upon a clear showing of an abuse of

discretion.'" (quoting *DG Creditor Corp. v. Dabah (In re DG Acquisition Corp.)*, 151 F.3d 75, 79 (2d Cir. 1998))). Likewise, the Bankruptcy Court has the discretion to decide an issue without holding an evidentiary hearing, and this Court can reverse such a decision only if it amounts to an abuse of discretion. *See Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 119 n.5 (2d Cir. 2003), *abrogated on other grounds*, *In re Zarnel*, 619 F.3d 156 (2d Cir. 2010); *see also D.A. Elia Constr. Corp. v. Damon & Morey, LLP (In re D.A. Elia Constr. Corp.)*, No. 04-CV-975A, 2006 WL 1720361, at *7 (W.D.N.Y. June 19, 2006) ("The bankruptcy court's decision to deny a full evidentiary hearing was not an abuse of discretion. The nature of the hearing lies within the sound discretion of the bankruptcy judge, and does not necessarily require the presentation of oral testimony." (citation omitted)), *aff'd sub nom. Bernheim v. Damon & Morey, LLP*, No. 06-3386-BK(LEAD), 2007 WL 1858292 (2d Cir. June 28, 2007). A Bankruptcy Court judge does not abuse her discretion in reaching a decision without holding an evidentiary hearing where "the record provided ample evidence on which the court could make such a decision." *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1313 (2d Cir. 1997); *see Gator Monuments Partners, LLLP v. Great Atl. & Pac. Tea Co., Inc. (In re Great Atl. & Pac. Tea Co., Inc.*, 526 F. App'x 25, 29 (2d Cir. 2013). In general, "[a] ruling is an abuse of discretion only if the bankruptcy court 'bases its ruling on a mistaken application of the law or a clearly erroneous finding of fact.'" *Stasko v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, No. 10-CV-4322 (JGK), 2011 WL 2462773, at *2 (S.D.N.Y. June 20, 2011) (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388 (2d Cir.

2005)); *see also Peskin v. Picard*, 440 B.R. 579, 584 (S.D.N.Y. 2010).

## III. DISCUSSION

### A. Legal Standards

"Section 507(a) of the Bankruptcy Code grants a first priority to '[a]llowed unsecured claims for domestic support obligations that, as of the date of the filing of the petition in a case under this title, are owed to or recoverable by a spouse [or] former spouse.'" *In re Conte*, No. 11-77836-AST, 2012 WL 4739339, at *3 (Bankr. E.D.N.Y. Oct. 3, 2012) (quoting 11 U.S.C. § 507(a)(1)(A)). "In addition to having priority status, DSO claims are nondischargeable pursuant to 11 U.S.C. § 523(a)(5)." *Id.* The Bankruptcy Code defines a DSO as follows:

> a debt that accrues before, on, or after the date of the order for relief in a case under this title, including interest that accrues on that debt as provided under applicable nonbankruptcy law notwithstanding any other provision of this title, that is—
>
> (A) owed to or recoverable by—
>
>> (i) a spouse, former spouse, or child of the debtor or such child's parent, legal guardian, or responsible relative; or
>>
>> (ii) a governmental unit;
>
> (B) in the nature of alimony, maintenance, or support (including assistance provided by a governmental

unit) of such spouse, former spouse, or child of the debtor or such child's parent, without regard to whether such debt is expressly so designated;

(C) established or subject to establishment before, on, or after the date of the order for relief in a case under this title, by reason of applicable provisions of—

(i) a separation agreement, divorce decree, or property settlement agreement;

(ii) an order of a court of record; or

(iii) a determination made in accordance with applicable nonbankruptcy law by a governmental unit; and

(D) not assigned to a nongovernmental entity, unless that obligation is assigned voluntarily by the spouse, former spouse, child of the debtor, or such child's parent, legal guardian, or responsible relative for the purpose of collecting the debt.

11 U.S.C. § 101(14A). The claimant bears the burden of proof to show that her claim is

a DSO entitled to priority under Section 507(a)(1). *See, e.g.*, *In re Micek*, 473 B.R. 185, 188 (Bankr. E.D. Ky. 2012); *In re Clark*, 441 B.R. 752, 755 (Bankr. M.D.N.C. 2011); *cf. Kavanakudiyil v. Kavanakudiyil (In re Kavanakudiyil)*, 143 B.R. 598, 602 (Bankr. S.D.N.Y. 1992) (holding that "complaining spouse has the burden of establishing that an obligation is nondischargeable on the ground that it is actually in the nature of alimony, maintenance or support" pursuant to Section 523(a)(5)).

At issue in the instant appeal is subsection (B) of Section 101(14A), *i.e.*, whether Bub's obligation to pay the SBA loan and to remove the SBA lien from the marital residence was "in the nature of . . . support" of Metal. 11 U.S.C. § 101(14A)(B). The parties do not dispute that this obligation was "owed to or recoverable by" Metal, 11 U.S.C. § 101(14A)(A), that the obligation was "established . . . before . . . the date of the order for relief in a case under this title, by reason of . . . a separation agreement [and] divorce decree," 11 U.S.C. § 101(14A)(C), and that the obligation was "not assigned to a nongovernmental entity," 11 U.S.C. § 101(14A)(D). Accordingly, the Court considers only the Bankruptcy Court's conclusion that Bub's obligation to pay the SBA loan and remove the SBA lien was "in the nature of . . . support."

"Whether a payment is alimony, maintenance or support . . . is a question of federal bankruptcy law, not of state law." *Brody v. Brody (In re Brody)*, 3 F.3d 35, 39 (2d Cir. 1993).[6] "Under bankruptcy law, the

---

[6] Congress added the term "domestic support obligation" to the Bankruptcy Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"). *See* Pub. L. 109-8. Nonetheless, *Brody*, and all other pre-BAPCPA cases referencing the former Section 523(a)(5), remain relevant for their analysis of whether a debt is in the nature of support. "Post-BAPCPA, the former

§ 523(a)(5) was incorporated into the new definition of 'domestic support obligation' found in § 101(14A), and the shorter 'domestic support obligation' became the new § 523(a)(5). Therefore, pre-BAPCPA § 523(a)(5) cases examining whether a debt was 'in the nature of alimony, maintenance, or support' are

intent of the parties at the time a separation agreement is executed determines whether a payment pursuant to the agreement is alimony, support or maintenance . . . ." *Id.* at 38. To examine the intent of the parties at any later point in time "would put federal courts in the position of modifying the matrimonial decrees of state courts, thus interfering with the delicate state systems for dealing with the dissolution of marriages and the difficult and complex results that flow therefrom." *Forsdick v. Turgeon*, 812 F.2d 801, 803–04 (2d Cir. 1987). "Courts have looked at a variety of factors in seeking to ascertain this mutual intent." *Brody*, 3 F.3d at 38 (citing *Vittorini v. Vittorini (In re Vittorini)*, 136 B.R. 632, 635 (Bankr. S.D.N.Y. 1992) (listing five factors); *Tsanos v. Bell (In re Bell)*, 47 B.R. 284, 287 (Bankr. E.D.N.Y. 1985) (listing nine factors)). "However, such a list is not necessarily exclusive. All evidence, direct or circumstantial, which tends to illuminate the parties' subjective intent is relevant." *Id.* Although federal bankruptcy law governs, "the status of a payment under state law is relevant to this determination." *Id.* at 39. Finally, as Section 101(14A)(B) states, this determination should be made "without regard to whether such debt is expressly so designated" in a separation agreement or divorce decree.

In assessing the intent of the parties at the time of the separation agreement, courts must bear in mind that the Second Circuit has broadly interpreted the meaning of "in the nature of . . . support." *See Falk & Siemer,*

LLP *v. Maddigan (In re Maddigan)*, 312 F.3d 589, 596 (2d Cir. 2002) ("We have clearly stated that among the concepts to be given broad interpretation is the meaning of 'in the nature of support.'" (citing *Pauley v. Spong (In re Spong)*, 661 F.2d 6, 9 (2d Cir. 1981))). Moreover, for purposes of an appeal, the Second Circuit has "held that the question whether a debt meets the statutory requirement for being in the nature of support is a factual determination of the bankruptcy court, and as such is subject to reversal only if clearly erroneous." *Maddigan*, 312 F.3d at 595 (citing *Forsdick*, 812 F.2d at 802); *see also Cooper v. Chudy (In re Cooper)*, 91 F. App'x 713, 714 (2d Cir. 2004) ("We evaluate whether an award constitutes such alimony, maintenance, or support under federal bankruptcy law as an issue of fact." (internal citations omitted)).

## B. Application

Rockstone contends that the Bankruptcy Court's DSO determination was clearly erroneous, and that the Bankruptcy Court abused its discretion by denying Rockstone's request for additional discovery and an evidentiary hearing. For the following reasons, the Court remands the case to the Bankruptcy Court for further development of the factual record.

As an initial matter, the Court rejects Rockstone's argument that the Bankruptcy Court's decision should be vacated simply because the Bankruptcy Court did not explicitly consider the eight factors set forth

---

relevant and inform the Court's analysis of whether the . . . debt is a domestic support obligation." *In re Dudding*, No. 10-10557, 2011 WL 1167206, at *5 (Bankr. D. Vt. Mar. 29, 2011) (citing *In re Boller*, 393 B.R. 569, 574–75 (Bankr. E.D. Tenn. 2008)); *see In re Nelson*, 451 B.R. 918 (Bankr. D. Or. 2011) ("In determining whether an obligation is a DSO entitled to priority under § 507(a), the court looks to the interpretation of DSO discussed in cases relating to the dischargeability of support under former § 523(a)(5).")

(emphasis removed)); *In re Johnson*, 397 B.R. 289, 296 (Bankr. M.D.N.C. 2008) ("DSO is a term derived from the definition of a nondischargeable debt for alimony, maintenance, and support contained in the former Section 523(a)(5); therefore, case law construing the former Section 523(a)(5) is relevant and persuasive.").

in *Conte*. *See* 2012 WL 4739339, at *6.[7] As noted *supra*, the Second Circuit has held that "no list of factors is necessarily exclusive" to determine whether an obligation is in the nature of support. *Young v. Butler (In re Butler)*, 308 B.R. 1, 21 (Bankr. S.D.N.Y. 2004) (citing *Brody*, 3 F.3d at 38). Accordingly, the Bankruptcy Court's failure to consider certain factors does not constitute reversible error *per se*. Instead, this Court assesses the Bankruptcy Court's DSO finding in light of "[a]ll evidence, direct or circumstantial, which tends to illuminate the parties' subjective intent." *Brody*, 3 F.3d at 38.

Moreover, under the circumstances of this case, the Bankruptcy Court correctly determined that the following three factors are highly relevant in determining whether a debtor's assumption of mortgage payments is a DSO: (1) whether the debtor's obligation directly or indirectly provided shelter for his former spouse; (2) whether the debtor's spouse would have been unable to remain in the marital home but for the debtor's obligation; and (3) whether there was a discrepancy in the incomes of the debtor and the debtor's spouse. (A-1, at 18.) As a general rule, "a spouse's assumption of mortgage debts which enable members of the family to remain in the marital residence is an obligation in the nature of support, maintenance or alimony." *Gianakas v. Gianakas (In re Gianakas)*, 917 F.2d 759, 764 (3d Cir. 1990) (citing *Sweeny v. Sweeny (In re Sweeny)*, 99 B.R. 192 (Bankr. D. Conn. 1989); *Coverdale v. Coverdale (In re Coverdale)*, 65 B.R. 126 (Bankr. M.D. Fla. 1986); *Wright v. Wright (In re Wright)*, 51 B.R. 630 (Bankr. S.D. Ohio 1985); *Newkirk v. Thomas (In re Thomas)*, 21 B.R. 571 (Bankr. E.D. Pa. 1982))); *see also In re Palmieri*, No. 11-51224-WSD, 2011 WL 6812336, at *5 (Bankr. E.D. Mich. Nov. 21, 2011); *Johnson*, 397 B.R. at 297; *Linet v. Azia (In re Azia)*, 159 B.R. 71, 74 (Bankr. D. Mass. 1993). In addition to the nature of the obligation itself, many of these decisions emphasize the disparity in the incomes of the debtor and the debtor's spouse at the time the settlement agreement or divorce took effect. *See, e.g.*, *Gianakas*, 917 F.2d at 763 (noting that debtor's spouse had no income at time of divorce, and settlement provided that debtor was to pay her $800 in child support and $200 in alimony each month); *Azia*, 159 B.R. at 74 ("I conclude that at the time of the Decree the parties intended the obligations set forth to serve as support for the Plaintiff *in light of the Defendant's superior earning capacity* and

---

[7] Those eight factors are as follows:

> (1) [W]hether the obligation terminates upon the death or remarriage of either spouse, upon any children reaching majority or upon some other similar event; (2) how the obligation is characterized in the parties' settlement agreement or divorce decree, and the context in which it appears; (3) whether the payments appear to balance disparate income between the former spouses; (4) whether the payments are to be made directly to the spouse or to a third party; (5) whether the payment is payable in a lump sum or in installments over

> time; (6) whether the parties intended to create an obligation of support or to divide marital property; (7) whether an assumption of debt has the effect of providing necessary support to insure that the daily needs of former spouse and any children of the marriage are met; (8) whether an assumption of debt has the effect of providing support necessary to insure a home for the non-debtor spouse and his or her minor children.

*Conte*, 2012 WL 4739339, at *6; *see also Blaustein v. Berg (In re Berg)*, 167 B.R. 9, 13 (Bankr. E.D.N.Y. 1994) (considering the same eight factors).

the Plaintiff's limited ability to earn an income sufficient to support herself and her minor children." (emphasis added)); *see also In re Dudding*, No. 10-10557, 2011 WL 1167206, at *9 (Bankr. D. Vt. Mar. 29, 2011) ("Given Ms. Burke's assumption of debt and *significantly lower income*, the Court finds that the Debtor's assumption of this debt had an effect tantamount to support because it provided Ms. Burke the financial relief she needed to meet her daily needs. Therefore, these factors weigh in favor of finding that the Debtor's assumption of the Wells Fargo debt constitutes a domestic support obligation." (emphasis added)). Conversely, where the debtor's spouse earned *more* than the debtor at the time the settlement agreement or divorce took effect, it is less likely that the parties intended the debtor's obligation to make mortgage payments to be a DSO. *See In re Tigner*, Bankruptcy No. 12-13209-WHD, 2013 WL 6211984, at *4 (Bankr. N.D. Ga. Oct. 7, 2013) (debtor's obligation to make mortgage payments was not in the nature of alimony, maintenance, or support, where, *inter alia*, debtor's spouse "earned a higher salary at the time of divorce"); *see also Nelson v. Mineer (In re Mineer)*, 11 B.R. 663, 665 (Bankr. D. Colo. 1981) ("Given the equal earning power, the assumption by the Defendant of the second mortgage payment does not represent an attempt to balance incomes; rather, it clearly appears to distribute equally the obligation for marital debts."). "Common sense dictates that the party with weaker financial means, upon marital separation from a party with stronger financial means, is much less likely to incur an obligation in the nature of alimony, maintenance, or support." *Pagels v. Pagels (In re Pagels)*, No. 10-71138-SCS, 2011 WL 577337, at *13 (Bankr. E.D. Va. Feb. 9, 2011).

In the instant case, the Bankruptcy Court recognized that the discrepancy in income between Bub and Metal was a critical factor to assess (*see* A-1, at 18); however, the Bankruptcy Court did not make enough factual findings to give this factor proper consideration. Specifically, the Bankruptcy Court found only that Metal earned $115,000 in 2005 (solely on the basis of Metal's affidavit), but the Bankruptcy Court did not make any findings as to Bub's income at that time. From this Court's own review of the record, the evidence of Bub's income at the time the settlement agreement was executed appears unclear and incomplete. Specifically, there appears to be a factual dispute regarding that issue. In one of Metal's depositions, Metal testified that she and Bub earned roughly the same incomes during most of the marriage, but that Bub earned the majority of the couple's income in 2004. (Metal N.Y. Dep. at 26, 52.) In Bub's deposition, Bub testified that he certainly earned less than $100,000 between 2005 and 2006, and that he had not drawn a salary from any of his companies between 2006 and 2010. (Bub Dep. at 85, 89–90.)

Because the Bankruptcy Court did not make a finding related to Bub's and Metal's relative incomes at the time of their separation agreement (and the record appears to contain a factual dispute on that issue), the Court must remand the case to the Bankruptcy Court for further factual development. *See, e.g.*, *Warex Terminals, Inc. v. Halstead Energy (In re Halstead Energy Corp.)*, 367 F.3d 110, 115 (2d Cir. 2004) (remanding case to Bankruptcy Court for further development of factual record, where Bankruptcy Court did not make certain factual findings in the first instance); *Forchelli, Curto, Deegan, Schwartz, Mineo, Cohn & Terrana, LLP v. Hirsch*, No. 09-CV-5575 (CBA), 2010 WL 2667198, at *3 (E.D.N.Y. June 23, 2010) (same); *accord Rush v. JLJ Inc. (In re JLJ Inc.)*, 988 F.2d 1112, 1116 (11th Cir. 1993) ("Neither the district court nor this court may make independent factual findings. If the

bankruptcy court is silent or ambiguous as to an outcome determinative factual question, the case must be remanded to the bankruptcy court for the necessary factual findings."); *Taylor v. Internal Revenue Serv.*, 69 F.3d 411, 417 (10th Cir. 1995) (same). On remand, the Bankruptcy Court retains the discretion to decide how to conduct further factual development on this issue. In particular, the Bankruptcy Court may determine that, in light of this lack of clarity in the record, additional discovery is warranted or may determine that the issue needs to be resolved at an evidentiary hearing.

## IV. CONCLUSION

For the reasons set forth herein, the Bankruptcy Court's July 22, 2013 order is vacated, and the case is remanded to the Bankruptcy Court for further proceedings consistent with this Memorandum and Opinion.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: April 2, 2014
      Central Islip, NY

\* \* \*

Appellant is represented by Paul A. Levine, Lemery Greisler, 50 Beaver Street, Albany, NY 12207. Appellee is represented by Robert L. Pryor, Pryor & Mandelup, LLP, 675 Old Country Road, Westbury, NY 11590.